## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:                                          :       CHAPTER 7
                                                :
MANN REALTY ASSOCIATES, INC.,                   :       CASE NO. 1-17-bk-01334-HWV
                        Debtor                  :
                                                :
MARKIAN R. SLOBODIAN, ESQ.,                     :
        Trustee for the Bankruptcy Estate of    :
        Mann Realty Associates, Inc.,           :
                        Movant                  :
                                                :
                v.                              :
                                                :
ADAMS COUNTY, TREASURY, ADAMS                   :
COUNTY TAX CLAIM BUREAU, BLUE                   :
RIDGE FASTENERS, INC., AGWAY                    :
PETROLEUM CORPORATION, HUNTINGTON               :
TOWNSHIP, WILSON BROWN MOTORS, INC.,            :
SEPARATION TECHNOLOGIES, INC., PPC              :
LUBRICANTS, PENNSY SUPPLY, RIVER DRIVE          :
SERVICE CENTER, INC., TANYA LAMO, TAX           :
COLLECTOR FOR HUNTINGTON TOWNSHIP,              :
ROBERT M. MUMMA, II and SUSAN R.                :
MUMMA,                                          :
                        Respondents             :


### OPINION

This matter came before the court for hearing on August 20, 2019 (the "Hearing") regarding

its December 21, 2018 Order (the "Sale Order") Granting the Trustee's Motion for Sale of the

Debtor's Real Estate Located at 2008 Idaville Road, Huntington Township, York Springs,

Pennsylvania (the "Real Property") Free and Clear of Liens, Claims, and Encumbrances (the "Sale

Motion") and the written submissions filed in response thereto by S&T Bank, successor by merger

to Integrity ("S&T Bank") and Robert M. Mumma, II and Susan R. Mumma, each requesting

distribution of proceeds from the sale.

## I.  Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.  Facts and Procedural History

The Debtor filed a voluntary petition under Chapter 11 of Title 11, U.S.C.[1] on March 31, 2017. The Debtor thereafter operated its business as a debtor in possession pursuant to § 1107 until January 25, 2018 when the case converted to a proceeding under Chapter 7 of the Code. The chapter 7 trustee (the "Trustee") was appointed in this case on January 26, 2018. Consistent with his duties under § 704(a), the Trustee has been diligently liquidating the Debtor's assets since that time. As part of these efforts, the Trustee filed the Sale Motion on October 9, 2018 seeking an order from this court authorizing the sale of the Real Property and requesting distribution of the proceeds from same. Though not disclosed in the Sale Motion, it is uncontested that the following mortgages and assignments were filed of record in the Office of the Recorder of Deeds for Adams County as of the commencement of this case:

> 1. Open-End Mortgage from McDermitt, Inc. ("McDermitt")[2] to Mercantile in the original amount of $1,000,000.00, recorded on 10/17/1994 in Record Book 951, Page 264 ("Mortgage I"), subsequently assigned to Robert M. Mumma, II by Assignment of Mortgage filed on 08/28/1995 at Record Book 1074, Page 28 ("Assignment I");

> 2. Open-End Mortgage from McDermitt to Mercantile in the original amount of $2,450,000.00 recorded on 10/17/1994 in Record Book 951, Page 294 ("Mortgage II"), subsequently assigned to Robert M. Mumma, II by Assignment of Mortgage filed on 08/28/1995 at Record Book 1074, Page 30 ("Assignment II");

---

[1] Unless otherwise noted, all future statutory references are to the Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Code")

[2] McDermitt, Inc. is a business entity owned by Mr. Mumma. McDermitt conveyed the Real Property to the Debtor by Deed dated 12/31/2001 and recorded on 05/22/2002 at Record Book 2670, Page 277.

3.     Mortgage from McDermitt to Robert M. Mumma, II and Susan R. Mumma in the original amount of $1,378,000.00 recorded on 05/30/2001 in Record Book 2297, Page 177 ("Mortgage III").

Mumma Exs. 2, 3, 6, 7, 9.[3]  Mortgage I and Mortgage II were given as security for two notes of even date therewith in the original amounts of $1,000,000.00 and $2,450,000.00, respectively (collectively, the "1994 Notes").  Mortgage III was given as security for a mortgage bond dated May 30, 2001 in the original amount of $1,378,000.00 (the "2001 Mortgage Bond").

In his Sale Motion, and with the consent of Mr. Mumma as assignee of Mortgage I, the Trustee requested authority to sell the Real Property and to distribute proceeds from the sale in the following manner: (1) to pay the ordinary and necessary costs of sale, including the Trustee's costs and expenses up to $10,000.00 and requiring the approval of Mr. Mumma for any costs and expenses exceeding that amount; (2) to deposit the additional sum of $10,000.00 into the Trustee's bank account for the benefit of unsecured creditors and administrative claims (the "Carve-out"); and (3) to pay all remaining proceeds to Mr. Mumma on account of his first priority claim as assignee of Mortgage I.  Mot. for Sale 5b, f, g, h, ECF No. 452.  A notice regarding the Sale Motion was served by the Trustee upon all creditors and parties in interest on October 10, 2018.  The notice contained the distribution provisions cited above and established a deadline of October 31, 2018 to object to the Sale Motion.  It also provided notice that a hearing on the Sale Motion and any timely objections filed thereto would be held on November 29, 2018.

Double M Real Estate, LLC, Martin L. Grass and Mark G. Caldwell t/a Double M. Development (collectively "Double M") filed a Limited Objection to the Sale Motion on October 23, 2018 (the "Double M Objection").  In its Objection, Double M did not object to sale of the Real

---

[3] Mortgage I, Mortgage II, Mortgage III, Assignment I and Assignment II were not disclosed by the Debtor in its Schedules or any amendments thereto.  Nor were they divulged the Disclosure Statements or Chapter 11 Plans filed in this matter. Indeed, not only did the Debtor fail to disclose these mortgages and assignments in its filings, it also incorrectly identified S&T Bank as the first and only holder of the mortgage lien against the Real Property.

3

Property but instead limited its objection to the Trustee's proposed distribution of sale proceeds to Mr. Mumma. S&T Bank filed a Joinder to Double M's Limited Objection on October 24, 2018 (the "S&T Bank Joinder"). Also on October 24, 2018, and without the knowledge of the court, the Trustee, or Mr. Mumma, S&T Bank caused a Writ of Execution and Garnishment (the "Writ of Execution") to be issued to the Trustee, as garnishee, directing the county Sheriff to attach any property of Mr. Mumma in the possession of the Trustee. The Writ of Execution was issued to satisfy a judgment obtained by S&T Bank against Mr. Mumma individually (the "S&T Bank Judgment") in the Cumberland County Court of Common Pleas (the "State Court").[4] Aside from the Double M Objection and the S&T Bank Joinder, no other objections to the Sale Motion were filed prior to the deadline of October 31, 2018.

At the November 29, 2018 hearing, the parties advised the court that the matter had "hit a snag" as the result of a new issue between S&T Bank and Mr. Mumma regarding distribution of sale proceeds. The exact nature of the issue was not disclosed to the court.[5] At the request of the parties, and to provide them with an opportunity to resolve this new issue, the hearing was continued to December 13, 2018. Prior to the continued hearing, however, on December 10, 2018, the Sheriff served the Writ of Execution upon the Trustee, as garnishee, attaching any property of Mr. Mumma in the Trustee's possession.[6] As a result of this service, S&T Bank takes the position that it is entitled to payment of any distribution to Mr. Mumma pursuant to Mortgage I or Mortgage II. Also on December 10, 2018, Mr. Mumma filed a Praecipe of Withdrawal of Consent ("Withdrawal of Consent") to the Sale Motion which reads in its entirety as follows:

---

[4] The S&T Bank Judgment appears to have been recorded or otherwise exemplified in the Dauphin County Court of Common Pleas to Docket Number 2017-CV-03312. This was necessary for the Writ of Execution to be issued and served upon the Trustee, whose offices are located within Dauphin County.

[5] There was no mention of the Writ of Execution at the November 29, 2018 hearing.

[6] Though the Writ of Execution was issued on October 24, 2018, it was not served upon the Trustee as garnishee until December 10, 2018 and the Trustee and Mr. Mumma did not become aware of its existence until sometime just before the November 29, 2018 hearing.

4

> Notice is hereby given that Robert M. Mumma, II, assignee of the first mortgage [sic] priority mortgage holder, hereby withdraws his consent to the Motion for Private Sale of Debtor's Real Estate located in Huntington, [sic] Township, Adams County, PA as docketed to No. 452 on the Docket in the above-captioned case.

Withdrawal of Consent, ECF No. 503.

Following the filing of the Withdrawal of Consent, S&T Bank became concerned that Mr. Mumma might attempt to subordinate or otherwise relinquish his individual right to payment as assignee of both Mortgage I and Mortgage II in favor of his collective right to payment with his wife, Susan R. Mumma, pursuant to Mortgage III, thereby circumventing the effect of the Writ of Execution. To address this concern, S&T Bank sought and obtained an Order from the State Court on December 11, 2018, enjoining Mr. Mumma "from negotiating, transferring, assigning or otherwise disposing (including subordinating) of his right to . . . any property interest . . . subject to execution including . . . payment under Mortgage I, Mortgage II . . . and any Note . . . or other document providing for payment to [Mr. Mumma] . . . including . . . the Sale Motion" (the "State Court Injunction"). Trustee Ex. 7.

At the December 13, 2018 continued hearing, the parties advised the court of the S&T Judgment, the issuance and service of the Writ of Execution, the State Court Injunction, and that the matter had "become something of a complicated mess." Notwithstanding the plight of their self-described condition, the parties remained optimistic that an agreement could be reached with the benefit of additional time. Thus, the hearing on the Sale Motion and the limited objections thereto was once again continued, this time to December 20, 2018, so the parties could attempt to resolve the matter. At the December 20, 2018 hearing, following brief argument and a short recess so the parties could negotiate, the parties advised the court that an order authorizing sale of the Real Property would be submitted to the court for signature with the consent of all parties. Such a consent order was indeed submitted to the court on December 21, 2018. The consent order was promptly signed by the court, thereby becoming the Sale Order in this matter.

5

The Sale Order authorized the sale of the Real Property as proposed in the Sale Motion. It also authorized distribution of the sale proceeds to pay the ordinary costs of sale, including the Trustee's costs and expenses up to $10,000.00 (and requiring the approval of Mr. Mumma for any costs and expenses exceeding that amount), and to deposit the Carve-out into escrow. However, the Sale Order did not authorize distribution of the remaining proceeds to Mr. Mumma pursuant to Mortgage I as originally proposed by the Trustee and demanded by Mr. Mumma. Instead, it ordered that all "[r]emaining sale proceeds (the "Remaining Proceeds") shall be escrowed by the Trustee in his bank account for Debtors' bankruptcy estate pending further Order of the Bankruptcy Court." Order Granting Mot. for Sale, Dec. 21, 2018, ECF No. 523. The Sale Order also contained the following new provision:

> All Respondents and parties in interest shall have thirty (30) days from the date of this Order to submit, either by proof of claim, amended proof of claim, objection, adversary proceeding, or other court filing permitted by the Rules of Bankruptcy Procedure any claim (including supporting documents and other verification) they may have with regard to the Remaining Proceeds or any objection (including supporting documents and other verification) they may have to distribution of all or part of the Remaining Proceeds to any party in interest[.]

ECF No. 523. Finally, the Sale Order scheduled a hearing on February 14, 2019 to consider distribution of the Remaining Proceeds as originally proposed by the Trustee in the Sale Motion, and any objections thereto or other claims submitted in accordance with the Sale Order. ECF No. 523.

Settlement on the sale of the Real Property occurred on December 27, 2018, as evidenced by the Report of Sale filed by the Trustee on February 11, 2019. Report of Sale, Feb. 11, 2019, ECF No. 533. The Report of Sale describes distribution of sale proceeds in a manner authorized by the Sale Order, and that the Carve-out in the amount of $10,000.00 and the Remaining Proceeds in the amount of $204,365.31 had each been escrowed by the Trustee. Report, ECF No. 533. Also of note, on January 17, 2019 the Trustee answered Interrogatories served upon him with the Writ of

6

Execution (the "Interrogatories"). Trustee Ex. 6. In his answers, the Trustee advised S&T Bank that Mr. Mumma has claimed that he is owed money from the sale of the Real Property and that his claim is subject to review and approval by the bankruptcy court. Trustee Ex. 6, 2. The Trustee's duty to answer and to update his answers to the Interrogatories is ongoing.

On January 22, 2019, Mr. and Mrs. Mumma responded to the Sale Order by filing an Amended Proof of Claim. In their Amended Proof of Claim, Mr. and Mrs. Mumma assert for the first time that Mortgage III was conveyed and filed of record "in the amount of $1,378,000.00, representing the amount still outstanding on" Mortgage I and Mortgage II. Mortgage III therefore, according to Mr. and Mrs. Mumma, took the place of both Mortgage I and Mortgage II. As a result of this, Mr. and Mrs. Mumma argue that Mortgage III was the only mortgage lien against the Real Property at the time of its sale and the Remaining Proceeds should therefore be distributed to them pursuant thereto.

S&T Bank also filed a Response to the Sale Order on January 22, 2019 (the "S&T Bank Response"). In its Response, S&T Bank observes that according to the public record Mr. Mumma is entitled to payment of the sale proceeds as assignee of Mortgage I and that the distribution originally proposed by the Trustee in the Sale Motion was therefore proper. S&T further observes that Mr. Mumma initially concurred with this conclusion as evidenced by his consent to the Sale Motion. It was only after Mr. Mumma learned that the Writ of Execution had been served upon the Trustee that he withdrew his consent to the Sale Motion. Response of S&T Bank 10, Jan. 22, 2019, ECF No. 528. Similarly, S&T Bank notes that Mr. Mumma did not begin arguing that distribution should be made pursuant to Mortgage III until after entry of the State Court Injunction and the Sale Order.

In view of the foregoing, S&T Bank asserts that Mr. Mumma is barred by the doctrine of laches and by the State Court Injunction from disputing or challenging his right to payment under

7

Mortgage I and/or Mortgage II and that this court should approve distribution of the Remaining Proceeds as originally proposed by the Trustee in the Sale Motion. S&T Response 12.

## IV.    Discussion

The question presented here is whether Mortgage III "replaced" Mortgage I and Mortgage II as claimed by Mr. and Mrs. Mumma. Recasting the issue in legal terms, the court must determine whether the 2001 Mortgage Bond constitutes a novation of the 1994 Notes. If a novation of the 1994 Notes did occur, then both Mortgage I and Mortgage II are likewise novated[7] and distribution of the Remaining Proceeds must be directed to Mr. and Mrs. Mumma pursuant to Mortgage III. Conversely, if a novation of the 1994 Notes did not occur, then both Mortgage I and Mortgage II remain in effect and distribution of all or a portion of the Remaining Proceeds must be directed to Mr. Mumma pursuant to Mortgage I and if necessary, Mortgage II.

The court begins its analysis by determining the controlling substantive law and assessing the burden of proof.

### A.    Controlling Substantive Law

A creditor's claim in bankruptcy arises in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying contrary provisions of the Bankruptcy Code. *Butner v. U.S.*, 440 U.S. 48, 55 (1979). Indeed, the "basic federal rule in bankruptcy is that state law governs the substance of claims" because Congress has "generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20 (2000) (internal quotation marks omitted); *see also Travelers Cas. & Sur. Co. of America v. Pacific Gas and Elec. Co.*, 549 U.S. 443, 450 (2007). The justifications for

---

[7] *See Weir v. Potter Title & Mortgage Guarantee Co.*, 185 A. 630, 633 (Pa. 1936) ("If the debt be extinguished by any means, the mortgage will become so likewise."); s*ee also Kaylor v. Cent. Trust Co. of Harrisburg*, 36 A.2d 825, 827 (Pa. 1944) (observing that payment, release, or extinguishment of either a note or its mortgage discharges both, unless otherwise intended by the parties).

8

application of state law are not limited to ownership interests; they apply with equal force to security interests and to assessing the burden of proof. *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 199 (2014) (quoting *Raleigh v. Illinois Dept. of Revenue,* 530 U.S. at 20–1); *Butner*, 440 U.S. at 55.[8] Accordingly, subject to any qualifying contrary provisions of the Code, Pennsylvania law governs this matter.

### B. Assessing and Defining the Burden of Proof

#### 1. Assessing the Burden of Proof

In view of the foregoing, it is appropriate to begin with a review of § 363 to assess who has the burden of proof in this matter. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56–7 (2005). The plain text of § 363(p) assigns the burden of proof on the issue of the validity, priority, or extent of an interest in property upon the entity asserting such interest.[9] 11 U.S.C. § 363(p)(2). Incidental to this burden is an obligation to prove the amount owed in connection with the claimed interest. *See In re Hotel Sierra Vista Ltd. P'ship*, 112 F.3d 429, 434 (9th Cir. 1997). Thus, § 363(p) imposes the burden of proof upon Mr. and Mrs. Mumma to establish the amount of their claim and their entitlement to the Remaining Proceeds pursuant to Mortgage III. Assigning the burden of proof to Mr. and Mrs. Mumma in the matter is also consistent with Pennsylvania law, which controls in the

---

[8] See also *Director, Office of Workers' Compensation Programs v. Greenwich Collieries,* 512 U.S. 267, 271 (1994) ("[T]he assignment of the burden of proof is a rule of substantive law ..."); *Garrett v. Moore–McCormack Co.,* 317 U.S. 239, 249 (1942) ("[T]he burden of proof ... [is] part of the very substance of [the plaintiff's] claim and cannot be considered a mere incident of a form of procedure.")).

[9] Subject to certain exceptions not relevant here, Fed. R. Bankr. P. 7001(2) requires a proceeding to determine the validity, priority, or extent of a lien or other interest in property to be brought as an adversary proceeding. However, this requirement is not jurisdictional, and the right to insist upon that procedural requirement can be waived or forfeited. *In re Yelverton*, No. 09-00414, 2015 WL 276345 at *5 (Bankr. D.D.C. Jan. 20, 2015) (citations omitted). Though the applicability of Rule 7001(2) to this matter is questionable, each of the parties waived this procedural requirement to the extent it applies and agreed to resolve this dispute within the context of the Sale Motion and Sale Order. Hr'g Recording, Aug. 6, 2019, 10:27:50–10:29:30.

9

absence of any qualifying contrary provisions of the Code.[10]   Accordingly, Mr. and Mrs. Mumma

have the burden of proof in this matter regardless of which system of law is applied.

### 2.   Defining the Burden of Proof

The term "burden of proof" is used to refer to two distinct burdens.  The first is the burden

of production and the second is the burden of persuasion. *Hurley v. Hurley*, 754 A.2d 1283 (Pa.

Super. Ct. 2000).[11] The party with the burden of production must produce sufficient evidence to

make a *prima facie* claim for the relief sought or lose summarily. *Haygood v. Civil Serv. Comm'n*,

576 A.2d 1184, 1185 (Pa. Commw. Ct. 1990).[12]  When considering whether the burden of

production has been met, the court must give the burdened party "the benefit of every fact and every

inference that may reasonably be deduced from the evidence," and must resolve all conflicts in that

party's favor.  *Lear v. Shirk's Motor Exp. Corp.*, 152 A.2d 883, 885 (Pa. 1959).[13] The court may not

assess credibility or gauge the weight of the evidence at this stage.  *Beary v. Pennsylvania Elec.*

*Co.*, 469 A.2d 176, 179 (Pa. Super. Ct. 1983).[14]

Once the party with the burden of production has produced sufficient evidence to satisfy that

burden, the case should be submitted to the fact finder to determine whether the party has also

satisfied the burden of persuasion.  *See, e.g. Kopar v. Mamone*, 215 A.2d 641 (Pa. 1966); *Heffernan*

*v. Rosser*, 419 Pa. 550, 215 A.2d 655 (1966).  To satisfy the burden of persuasion, the burdened

party must produce sufficient evidence to convince the court that a fact has been established.[15]  At

---

[10] Generally, "the burden of proof ... rests upon the party who ... asserts the affirmative of an issue"; thus, "one alleging a fact ... has the burden of establishing it."  *V.W. v. Dep't of Pub. Welfare*, 51 A.3d 282, 285 (Pa. Commw. Ct. 2012) (citations omitted).

[11] *See also Com. v. Jury*, 636 A.2d 164 (Pa. Super. Ct. 1993).

[12] *See also Vann v. Unemployment Compensation Board of Review*, 494 A.2d 1081 (Pa. 1985); *Smith v. Bell Tel. Co. of Pa.*, 153 A.2d 477 (Pa. 1959); *Lear v. Shirk's Motor Exp. Corp.*, 152 A.2d 883 (Pa. 1959); *Skeen v. Stanley Co. of America*, 66 A.2d 774 (Pa. 1949); *Henderson v. National Drug Co.*, 23 A.2d 743 (Pa. 1942).

[13] *See also McElhinny v. Iliff*, 260 A.2d 739 (Pa. 1970); *Statler v. Pennsylvania R. Co.*, 149 A. 494 (Pa. 1930); *Heffner by Heffner v. Schad*, 478 A.2d 1372 (Pa. Super. Ct. 1984).

[14] *See also Keeler v. International Harvester Used Truck Center*, 463 A.2d 1176, 1178 (Pa. Super. Ct. 1983).

[15] *Hurley*, 754 A.2d at 1283 (Pa. Super. Ct. 2000).

this stage, the court must resolve evidentiary conflicts and questions of credibility and must accept or reject inferences that may reasonably be drawn from the evidence. *Smith v. Bell Tel. Co. of Pa.*, 153 A.2d 477 (Pa. 1959).[16]  It is entirely possible to satisfy the burden of production yet fail to satisfy the burden of persuasion. *See, e.g., Burleson v. Pennsylvania Public Utility Com'n*, 501 Pa. 433, 461 A.2d 1234 (1983).  The fact finder is free to reject even unrebutted evidence. *Bezerra v. National R.R. Passenger Corp.*, 760 A.2d 56 (Pa. Super. Ct. 2000).

### 3. The Standard of Proof

While there are exceptions to the rule, it has long been established that the burdened party in a civil action must meet their burden by a preponderance of the evidence, which is the lowest standard of proof. *Johns v. Shaler Twp.*, 368 A.2d 339, 339–40 (Pa. Super. Ct. 1976); *O'Toole v. Braddock Borough*, 155 A.2d 848 (Pa. 1959); *Se-Ling Hosiery Co. v. Margulies*, 70 A.2d 854 (Pa. 1950). A preponderance of the evidence is "the greater weight of the evidence, *i.e.*, to tip a scale slightly is the criteria or requirement for preponderance of the evidence." *In re Navarra*, 185 A.3d 342, 354 (Pa. Super. Ct. 2018) (quoting *Raker v. Raker*, 847 A.2d 720, 724 (Pa. Super. 2004); *See also O'Toole v. Borough of Braddock*, 397 Pa. 562, 564, 155 A.2d 848, 850 (1959) ("When the jury finds that the pan on the plaintiff's side of the scales of justice has descended below the horizontal, while the defendant's dish has risen above the level plane, the plaintiff has met his burden …").  This is the standard of proof that Mr. and Mrs. Mumma must meet.

### C. Novation or Collateral Security

The legal presumption under Pennsylvania law is that the acceptance of a new note in place of an old note is not taken as satisfaction of the earlier note, but is received as collateral security for the original payment. *Citizens' Bank of Wind Gap v. Lipschitz*, 145 A. 831, 832 (Pa. 1929)

---

[16] *See also Borough of Nanty-Glo v. American Surety Co. of New York*, 163 A. 523 (Pa. 1932).

(citations omitted). Of course, the contrary is true where parties mutually agree to release one another from liability on a valid note and to substitute a new note in place of the old one, but the burden of showing such an agreement is upon the one who asserts the release. *Id.* (citations omitted).

To that point, when parties to a contract mutually agree to release one another from liability on a valid contract and to substitute a new contract in place of the old one, a novation occurs.[17] *First Pennsylvania Bank, N. A. v. Triester*, 380 A.2d 826, 830–31 (Pa. Super. Ct. 1977). Under Pennsylvania law, the elements of a novation are (1) the displacement and extinction of a prior contract; (2) the substitution of a valid new contract for the prior contract; (3) sufficient legal consideration for the new contract; and (4) the consent of the parties. *Mason v. Range Res.- Appalachia LLC*, 120 F. Supp. 3d 425, 448 (W.D. Pa. 2015) (citing *Yoder v. T.F. Scholes, Inc.*, 173 A.2d 120, 121–22 (Pa. 1961); *First Lehigh Bank v. Haviland Grille, Inc.,* 704 A.2d 135, 138 (Pa. Super. Ct. 1997). "[W]hether a contract has the effect of a novation primarily depends upon the parties' intent." *Mason*, 120 F. Supp. 3d. at 448 (quoting *First Lehigh Bank,* 704 A.2d at 138).

The party claiming the existence of a novation "bears the burden of demonstrating the parties had a meeting of the minds." *Id.* Evidence of the parties' intent to enter into a novation "may be shown by other writings, or by words, or by conduct or by all three." *Buttonwood Farms, Inc. v. Carson*, 478 A.2d 484, 487 (Pa. Super. Ct. 1984). Whether there has been a novation is a question of fact. *Triester*, 380 A.2d at 831 (Pa. Super. Ct. 1977). A party seeking to establish that a note was intended to discharge and substitute for an earlier note must overcome the presumption that the original note is valid by introducing some evidence of mutual assent to the purported novation. *Id.*

---

[17] Principles of contract law apply with equal force to the law of negotiable instruments, such as promissory notes. *See* 13 Pa.C.S.A. § 3601(a) (Discharge on an instrument such as a note may occur by any act or agreement "which would discharge an obligation to pay money under a simple contract").

In the absence of such proof, no question of fact exists. *See U. S. Savings and Trust Co. v. Helsel*, 2 A.2d 823 (Pa. 1938); *Ellis v. Sokoloff*, 148 A. 707 (Pa. 1930).

In view of the above standard, Mr. and Mrs. Mumma must establish that they, along with McDermitt,[18] intended the 2001 Mortgage Bond to constitute a novation of the 1994 Notes and that Mr. Mumma, as the holder of the 1994 Notes, assented to same. The court will now examine the evidence presented to determine whether Mr. and Mrs. Mumma have met their burden on this issue.

### D.     The Evidence

Mr. Mumma provided testimony on behalf of each of the relevant parties. He testified on behalf of McDermitt as the obligor on the 1994 Notes, the 2001 Mortgage Bond, and as the Mortgagor on Mortgages I, II, and III. Mr. Mumma also testified in his individual capacity as the holder by assignment of the 1994 Notes and Mortgage I and Mortgage II. Finally, he testified on behalf of himself and his wife, Susan R. Mumma, as joint holders of the 2001 Mortgage Bond and Mortgage III. In these various capacities, Mr. Mumma testified that each of the parties intended Mortgage III to replace Mortgage I and Mortgage II.[19] He further testified that marital funds were used to purchase the 1994 Notes and Mortgage I and Mortgage II,[20] and that those instruments should have been assigned to himself and Susan R. Mumma, as husband and wife, rather than to himself, individually.[21] The fact that this did not occur, Mr. Mumma claims, is because Mrs. Mumma did not attend settlement on the transaction and that the 1994 Notes and Mortgage I and Mortgage II were thus assigned exclusively to him in error.[22] The purpose of the 2001 Mortgage Bond and Mortgage III then, according to Mr. Mumma, was to correct this error by executing

---

[18] McDermitt was the owner of the Real Property at the time the 2001 Mortgage Bond and Mortgage III were executed. The Real Property was later transferred to Mann Realty, Inc.
[19] Hr'g Tr. 16:1–5; 17:6–9; 46:10–47:2; 47:8–12; 47:21–23; 48:9–14; 50:24–51:2; 61:4–7; 83:21–23.
[20] Hr'g Tr. 35:20–25; 46:10–47:2.
[21] Hr'g Tr. 35:10–18; 61:11–62:10.
[22] Hr'g Tr. 44:10-11; 61:11-23; 62:3-10.

13

Mortgage III as a "reformed mortgage" or "corrected mortgage."[23] To accomplish this, Mr. Mumma testified that he instructed McDermitt's comptroller to calculate the amount due to him under each of the 1994 Notes after crediting the value of certain assets abandoned by McDermitt to a separate company that he owned.[24] He then caused the 2001 Mortgage Bond to be executed by McDermitt in favor of himself and Mrs. Mumma in the amount calculated by the comptroller. When asked why Mortgage I and Mortgage II were not satisfied of record following the recording of Mortgage III, Mr. Mumma testified that "[w]e issued a new mortgage, and the attorney that issued that should have satisfied the other two because they were satisfied." Hr'g Tr. 83:21–3.[25] He also testified that "[w]hat happened with not filing a satisfaction piece was just - - I don't know. That wouldn't have been for us to do, it would have been for the attorney to do." Hr'g Tr. 78:4–6. Mrs. Mumma testified that although she recalled obtaining a mortgage from McDermitt in connection with the Real Property in 2001, she did not recall the reason or purpose for receiving it. Hr'g Tr. 100:4–9.

### E. The Burden of Proof

#### 1. The Burden of Production

The court finds that Mr. and Mrs. Mumma have produced just enough evidence to avoid losing summarily on their claim that the 2001 Mortgage Bond was intended to be a novation of the 1994 Notes.[26] In so finding, the court affords Mr. and Mrs. Mumma "the benefit of every fact and every inference that may reasonably be deduced from the evidence," and resolves all conflicts in their favor. Further, the court does not assess the credibility of the testimony provided or gauge the weight of any of the evidence of record in making this determination.

---

[23] Hr'g Tr. 46:10–47:9; 61:4–7; 78:1–3; 117:21–2.
[24] Hr'g Tr. 48:9–14; 61:4–7; 62:11–8; 77:4–17; 77:21–78:3.
[25] *See also* Hr'g Tr. 47:24–48:8; 78:14–18; 118:10–2.
[26] Though the parties did not directly mention the 1994 Notes or the 2001 Mortgage Bond in their presentations, this court understands references to Mortgage I and Mortgage II as encompassing the 1994 Notes, and references to Mortgage III as encompassing the 2001 Mortgage Bond. Hr'g Tr. 71:9-15.

14

Under this standard, the court finds that Mr. Mumma's testimony on behalf of all of the relevant parties is enough to establish a *prima facie* case and to avoid losing summarily on their claim. The parties to the transaction are best positioned to know whether the 2001 Mortgage Bond was intended to operate as a novation of the 1994 Notes, and Mr. Mumma's testimony offered on behalf of each of the parties to the transaction in this regard must therefore be recognized as evidence of same at this stage. In so finding, the court is mindful that unresolved conflicts do exist between the conduct of the parties and the testimony offered, and also between Mr. Mumma's testimony and other evidence of record. Because the court here is merely deciding whether Mr. and Mrs. Mumma have met their initial burden of production, however, the court appropriately resolves each of those conflicts in favor of Mr. and Mrs. Mumma, and does not assess the credibility of the testimony offered.

Subject to these limitations, the court finds that Mr. and Mrs. Mumma have produced just enough evidence to avoid losing summarily on their claim that the 2001 Mortgage Bond was intended to be a novation of the 1994 Notes. Meeting this initial burden, however, is not determinative of the case. The court must now consider all the evidence presented and decide, based upon the weight of that evidence, whether Mr. and Mrs. Mumma have established that the 2001 Mortgage Bond constitutes a novation of the 1994 Notes.

### 2.       The Burden of Persuasion

To satisfy the burden of persuasion in a civil matter, the burdened party must convince the court by a preponderance of the evidence that a fact has been established. When determining whether this burden has been met, the court must resolve evidentiary conflicts and questions of credibility and must accept or reject inferences that may reasonably be drawn from the evidence.

Applying this standard, the court finds that Mr. and Mrs. Mumma have failed to satisfy their burden of persuasion. This is so because the evidence produced in this matter conflicts in

meaningful respects with their contention that Mortgage III replaced Mortgage I and Mortgage II and the testimony offered to resolve these conflicts is not credible. The evidence thus does not preponderate to the benefit of Mr. and Mrs. Mumma and the court is not persuaded that Mortgage III replaced Mortgage I and Mortgage II as they contend.

The court begins by identifying the conflicts that exist between the evidence produced and Mr. and Mrs. Mumma's contention that Mortgage III replaced Mortgage I and Mortgage II. Prior to filing the Amended POC on January 22, 2019, Mr. Mumma unfailingly asserted a first priority lien against the Real Property as assignee of Mortgage I. He initially did so while negotiating with the Trustee before the Sale Motion was filed. He then did so again in his December 11, 2018 Withdrawal of Consent.[27] Finally, Mr. Mumma asserted a priority lien against the Real Property as assignee of Mortgage I at the December 20, 2018 Hearing, and by negotiating and agreeing to entry of the Sale Order on December 21, 2018. By asserting this position, Mr. Mumma exercised absolute command over the entire sale process and claimed a legal right to the proceeds from same. The words and conduct of Mr. Mumma in this regard are in direct conflict with Mr. and Mrs. Mumma's present contention that Mortgage III replaced Mortgage I and Mortgage II in 2001. Strangely, this conflict is left entirely unaddressed by the record. With the exception of Mr. Mumma's general testimony that the parties intended Mortgage III to replace Mortgage I and Mortgage II, there is no evidence or testimony in the record that even attempts to reconcile Mr. Mumma's words and conduct above with the argument presently advanced by Mr. and Mrs. Mumma.

Additionally, the court finds it curious that Mr. and Mrs. Mumma, as the joint holders of Mortgage III, did not file an objection to the Sale Motion. Recall that the Sale Motion recognized

---

[27] The court notes that December 11, 2018 also happens to be the same day the Trustee was served with the Writ of Execution.

16

Case 1:17-bk-01334-HWV    Doc 707    Filed 10/22/19    Entered 10/22/19 15:26:37    Desc Main Document    Page 16 of 24

Mortgage I and Mortgage II as senior to Mortgage III and proposed distribution to Mr. Mumma individually as assignee of Mortgage I. If Mortgage III had truly replaced Mortgage I and Mortgage II as Mr. and Mrs. Mumma now contend, then they should have filed a timely objection to the Sale Motion on those grounds and demanded distribution of the sale proceeds pursuant to Mortgage III. They did not. When asked why no such objection to the Sale Motion was filed, Mr. Mumma's initial response was: "When we got into this – I didn't file an objection to it. If [my attorney] did, it's – I – I don't know." Hr'g Tr. 87:21–88:1. When asked that same question again, Mr. Mumma responded: "Because my wife hired an attorney . . . to negotiate with [the Trustee] that my wife would get proceeds. And based on that, we didn't file any objection to the sale." Hr'g Tr. 88:4–7. This testimony, at best, does not reconcile Mr. and Mrs. Mumma's failure to object to the Sale Motion with their current contention and, at worst, represents evidence that Mortgage III was never intended to replace Mortgage I and Mortgage II. With the exception of Mr. Mumma's general testimony that the parties intended Mortgage III to replace Mortgage I and Mortgage II, there is no other testimony or evidence of record that attempts to resolve the conflict between Mr. and Mrs. Mumma's failure to object to the Sale Motion and the position they now argue.

Furthermore, the documents and writings of record in this matter either fail to support or are in direct conflict with Mr. and Mrs. Mumma's contention that Mortgage III replaced Mortgage I and Mortgage II in 2001. The language of the 2001 Mortgage Bond does not revoke the 1994 Notes. Indeed, it does not even acknowledge that they exist. If Mr. and Mrs. Mumma intended the 2001 Mortgage Bond to constitute a novation of the 1994 Notes as they now claim, then it would have been logical (and reasonably prudent) for them to place a reference to that effect in the 2001 Mortgage Bond. They did not. Even more revealing is the language of Mortgage III, which not only fails to revoke the 1994 Notes or their attendant mortgages, it actually declares that the lien granted therein is "[s]ubject to, all other mortgages, judgements and liens of priority in accordance

17

with law." Mumma Ex. 9. It is uncontested that Mortgage I and Mortgage II were "liens of priority in accordance with law" at the time the 2001 Mortgage Bond and Mortgage III were executed and recorded. This evidence directly conflicts with Mr. and Mrs. Mumma's present argument. As with the conflict involving Mr. Mumma's words and conduct above, and aside from the general testimony of Mr. Mumma to the contrary, there is no evidence or testimony in the record that attempts to reconcile the language of the documents and writings in this matter with the argument now presented by Mr. and Mrs. Mumma.

Finally, the evidence establishes that Mortgage I and Mortgage II were not satisfied of record immediately following the recording of Mortgage III as would be expected with a replacement or novation. Indeed, it is undisputed that Mortgage I and Mortgage II were *never* satisfied and that they remained of record at the time this case was filed, approximately 16 years later. This failure to satisfy Mortgage I and Mortgage II conflicts with Mr. and Mrs. Mumma's contention that Mortgage III replaced Mortgage I and Mortgage II in 2001. If Mortgage III had truly replaced Mortgage I and Mortgage II as Mr. and Mrs. Mumma contend, then they should have filed satisfaction pieces with the Adams County Recorder of Deeds satisfying Mortgage I and Mortgage II when Mortgage III was filed.[28] They did not. When asked by the court why no such satisfaction pieces were filed, Mr. Mumma responded that "[w]hat happened with not filing a satisfaction piece was just - - I don't know. That wouldn't have been for us to do, it would have been for the attorney to do." Hr'g Tr. 78:4–6. The court finds this cavalier attitude somewhat incredible given the alleged purpose of the transaction. Apart from Mr. Mumma's general testimony that the parties intended Mortgage III to replace Mortgage I and Mortgage II, there is no other testimony or evidence of record that seeks to resolve the conflict between Mr. and Mrs. Mumma's failure to satisfy Mortgage I and Mortgage II and the position they now argue.

---

[28] This is particularly true given the language appearing in Mortgage III as referenced above.

18

Mr. Mumma's repeated assertion of a priority lien as assignee of Mortgage I, Mr. and Mrs. Mumma's failure to object to the Sale Order, the language of the instruments at issue here, and the failure to satisfy Mortgage I and Mortgage II each represent compelling and credible evidence that Mortgage III was not intended to replace Mortgage I and Mortgage II. In contrast, the only evidence presented in support of Mr. and Mrs. Mumma's contention that Mortgage III was intended replace Mortgage I and Mortgage II is Mr. Mumma's general testimony to that effect. Unfortunately for Mr. and Mrs. Mumma, Mr. Mumma's testimony in this regard was not credible.

As a witness, Mr. Mumma was equivocal and demonstrated a poor memory and knowledge of the facts in question. His self-serving testimony was also largely uncorroborated and, as described above, in significant conflict with the other evidence. Mr. Mumma could not recall the balances due under each of the 1994 Notes at the time the 2001 Mortgage Bond was executed. Nor could he clearly describe or assess the property that he claims was abandoned by McDermitt to another company, the value of which was credited against the amounts due under each of the 1994 Notes. Instead, Mr. Mumma testified that he instructed someone else to perform these calculations and assessments, and that he did not have independent memory of the amounts due, the property abandoned, or the value of same. Despite Mr. Mumma's lack of knowledge or memory on these critical matters, which must have been known to him before he testified, no corroborating testimony was offered by the employee who is said to have performed these calculations in 2001.

Likewise, Mr. Mumma's testimony that marital funds were used to purchase the 1994 Notes and Mortgage I and Mortgage II, and that the Assignments were therefore in error, was vague, uncorroborated, and largely irrelevant in any event. If the Assignments were made in error as Mr. Mumma claims, then it would have been prudent (and easier) for Mr. and Mrs. Mumma to simply seek and obtain corrected assignments in 2001 or at some point during the 16 years thereafter. Alternatively, Mr. Mumma simply could have assigned Mortgage I and Mortgage II from himself,

19

individually, to himself and his wife, jointly. Instead, no such corrective action was taken. When asked why they did not seek corrective assignments, Mr. Mumma was evasive and vague. Hr'g Tr. 63:4–12; 76:25–77:17. This testimony is neither persuasive or credible in view of the other evidence in this case.

Finally, Mr. Mumma's testimony explaining why Mortgage I and Mortgage II were never satisfied is not credible. It stretches credulity to believe that Mortgage I and Mortgage II were unsatisfied for nearly 16 years only because Mr. and Mrs. Mumma's attorney forgot to file the satisfaction pieces in connection with a transaction whose *sole purpose* was to satisfy Mortgage I and Mortgage II. Since the success of the 2001 transaction was entirely dependent upon the filing of those satisfaction pieces, one would reasonably expect Mr. and Mrs. Mumma to prioritize and confirm the filing of same. Clearly, they did not. The most reasonable inference to be drawn from this indifference towards the filing of the satisfaction pieces is that Mortgage III was never really intended to replace Mortgage I and Mortgage II.

This court concludes that the theory advanced by S&T Bank to explain Mr. Mumma's conduct and testimony in this matter is correct. That is, Mortgage III was never intended to replace Mortgage I and Mortgage II as claimed by Mr. and Mrs. Mumma. As S&T Bank points out, it was only after it obtained Mr. Mumma's right to payment of the Remaining Proceeds through service of the Writ of Execution that Mr. Mumma withdrew his consent to the Sale Motion. Likewise, it was only after the entry of the State Court Injunction and the Sale Order that Mr. Mumma abandoned his individual claim to the Remaining Proceeds as assignee of Mortgage I and began asserting a marital claim to same pursuant to Mortgage III. The obvious deduction here is that Mr. Mumma changed his position as a matter of convenience, rather than as a matter of fact, to circumvent the effect of the Writ of Execution. This conclusion resolves all evidentiary conflicts.

20

In view of the foregoing, this court finds that the weight of the evidence preponderates heavily in favor of a finding that the 2001 Mortgage Bond does not constitute a novation of the 1994 Notes and that Mortgage III thus did not replace Mortgage I and Mortgage II as argued by Mr. and Mrs. Mumma. Mortgage I and Mortgage II therefore maintain their senior positions relative to Mortgage III and distribution of all or a portion of the Remaining Proceeds must occur to Mr. Mumma pursuant to Mortgage I and Mortgage II before any distribution can be made to Mr. and Mrs. Mumma pursuant to Mortgage III. The next question presented to this court, then, is how much of the Remaining Proceeds should be distributed to Mr. Mumma pursuant to Mortgage I.

### F. The Doctrine of Judicial Estoppel

Mr. Mumma is estopped from denying that the balance due on the obligation secured by Mortgage I is less than the amount of the Remaining Proceeds. This is so because Mr. Mumma assumed this position earlier in these proceedings and, by negotiating and consenting to entry of the Sale Order, persuaded the court of its correctness. He may not now assume a different position as doing so would be to the detriment of S&T Bank and would also threaten the integrity of this court.

It is well settled that "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749, (2001) (quoting *Davis v. Wakelee,* 156 U.S. 680, 689 (1895)). This rule, known as judicial estoppel, "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Id*. (citing *Pegram v. Herdrich,* 530 U.S. 211, 227, n. 8 (2000)). The Supreme Court of the United States has recognized that the purpose of judicial estoppel is "to protect the integrity of the judicial process," by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id*. (quoting *Edwards v.*

*Aetna Life Ins. Co.,* 690 F.2d 595, 598 (6th Cir. 1982) and *United States v. McCaskey,* 9 F.3d 368, 378 (5th Cir. 1993)).[29]

Several factors typically inform the decision whether to apply the doctrine in a case. First, a party's later position must be "clearly inconsistent" with its earlier position. *Id.* at 750 (citations omitted). Second, courts inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding (or in the same proceeding) would create "the perception that either the first or the second court was misled." *Id.* at 750–51 (quoting *Edwards,* 690 F.2d, at 599).[30] A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Id.* at 751.

All the elements necessary to invoke the doctrine of judicial estoppel are present in this case. The current position advocated by Mr. Mumma is clearly inconsistent with his prior position that the Remaining Proceeds must be distributed to himself individually as assignee of Mortgage I. By negotiating and consenting to entry of the Sale Order, Mr. Mumma plainly succeeded in persuading the Trustee, S&T Bank, and this court to accept his earlier position. Because of this, the court cannot judicially accept his current position without creating the perception that the court was either misled when it entered the Sale Order or that it was misled when it accepted the current and inconsistent position. Finally, Mr. Mumma would derive an unfair advantage or impose an unfair detriment upon S&T Bank if not estopped. This is so because S&T Bank has caused the Writ of Execution to be issued and served upon the Trustee, as garnishee, thereby obtaining Mr. Mumma's right to payment of the Remaining Proceeds pursuant to Mortgage I. If the court accepts Mr. and

---

[29] *See also Scarano v. Central R. Co.,* 203 F.2d 510, 513 (3d. Cir. 1953) (judicial estoppel prevents parties from "playing 'fast and loose with the courts.'") (quoting *Stretch v. Watson*, 69 A.2d 596, 603 (N.J. Super. Ct. 1949)).
[30] Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," *United States v. C.I.T. Constr. Inc.,* 944 F.2d 253, 259 (5th Cir. 1991), and thus poses little threat to judicial integrity.

Mrs. Mumma's current argument that Mortgage III replaced Mortgage I and Mortgage II, then Mr. Mumma will have circumvented the effect of the Writ of Execution to the detriment of S&T Bank. Therefore, Mr. Mumma is estopped from denying that the balance due on the obligation secured by Mortgage I is less than the amount of the Remaining Proceeds.

Before concluding, the court will address a matter not asserted in the pleadings, but nonetheless raised by the parties during the Hearing. That is, whether S&T Bank violated the automatic stay provisions of § 362(a) when it caused the Writ of Execution to be served upon the Trustee, as garnishee for Mr. Mumma. The court concludes that it did not. This is so because the Writ of Execution is not a proceeding against the Debtor or against property of the Debtor's estate.

Although the scope of the automatic stay is broad, the clear language of § 362(a) indicates that it stays only proceedings against a "debtor" or against "property of the estate"—terms used by the statute itself. 11 U.S.C. § 362; *See Mar. Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991), *reh'g granted and opinion vacated* (Jan. 10, 1992), *opinion reinstated on reh'g* (Mar. 24, 1992). The Writ of Execution issued pursuant to the State Court Judgment and served at the request of S&T Bank involves neither. It was issued pursuant to a judgment obtained by S&T Bank against Mr. Mumma—not the Debtor. Likewise, the Writ of Execution seeks only to attach to the property interests of Mr. Mumma—not property of the estate. The Writ of Execution, therefore, is not a proceeding against the Debtor or against property of the estate and as such is not stayed by § 362(a).

### IV. Conclusion

Although Mr. and Mrs. Mumma have produced just enough evidence to avoid losing summarily on their claim that the 2001 Mortgage Bond was intended to be a novation of the 1994 Notes, the court finds that they have not met their burden of persuasion in this matter. This is so because the evidence produced in this matter conflicts in meaningful respects with their contention

23

that Mortgage III replaced Mortgage I and Mortgage II and the testimony offered to resolve these conflicts is not credible. The evidence thus does not preponderate to the benefit of Mr. and Mrs. Mumma and the court is not persuaded that Mortgage III replaced Mortgage I and Mortgage II as they contend. Mortgage I and Mortgage II therefore remain senior to Mortgage III relative to the Real Property. Further, this court finds that Mr. Mumma is estopped from denying that the balance due on the obligation secured by Mortgage I is less than the amount of the Remaining Proceeds. Distribution of the full balance of the Remaining Proceeds must be therefore be directed to Mr. Mumma pursuant to Mortgage I. Finally, S&T Bank did not violate the automatic stay provisions of § 362(a) when it caused the Writ of Execution to be issued and served upon the Trustee, as garnishee for Mr. Mumma.

An appropriate order will follow.

Dated:  October 22, 2019                    By the Court,

Henry W. Van Eck, Bankruptcy Judge (JH)

Case 1:17-bk-01334-HWV    Doc 707    Filed 10/22/19    Entered 10/22/19 15:26:37    Desc
Main Document    Page 24 of 24